# In the United States Court of Federal Claims

No. 11-377C
(Filed: March 15, 2013)

| | | |
|---|---|---|
| RALPH J. LAMSON, | ) | |
| | ) | Claim construction; "virtual reality |
| Plaintiff, | ) | immersion therapy" method patent |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*Bruce E. Burdick*, Alton, IL, for plaintiff.

*Gary L. Hausken,* United States Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, and *John Fargo*, Director, for defendant.

## OPINION

**FIRESTONE**, *Judge*.

This is a patent infringement case brought under 28 U.S.C. § 1498[1] (2006).

Plaintiff Ralph J. Lamson ("plaintiff") alleges that defendant the United States ("the

government") has infringed United States Patent Number 6,425,764 ("'764 patent"),

which was filed by plaintiff in 1997 and entitled "Virtual Reality Immersion Therapy for

---

[1] 28 U.S.C. § 1498(a) reads in relevant part: "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

Treating Psychological, Psychiatric, Medical, Educational and Self-Help Problems."[2]

Now before the court are the parties' briefs regarding the construction of seven claim

terms used in the '764 patent.

# I.    BACKGROUND

The '764 patent lays claim to certain virtual reality immersion therapy ("VRIT")

methods for treating psychological, psychiatric, and medical conditions.  Plaintiff alleges

that at least as early as 2004, the United States Department of Defense, Department of

Veterans Affairs, and Department of Health and Human Services have used, directly and

through procurement and grant contracts, the VRIT methods described in the '764 patent

without authorization by plaintiff, most prominently for treating post-traumatic stress

disorder.

## A.    The '764 patent.

In general terms, the '764 patent describes a method for treating psychological,

psychiatric or medical conditions by exposing patients to an interactive virtual reality

environment and providing sensors that monitor and evaluate a patient's responses the

virtual reality environment.  The Abstract of the '764 patent describes the VRIT methods

as follows:

> A method of treating a psychological, psychiatric, or medical condition by
> choosing a psychological strategy for treating the condition, encoding
> electronic instructions for a virtual reality environment in such a way that
> the interactive virtual reality environment implements the psychological

---

[2]  Plaintiff's original complaint also alleged that the government "took" the '764 patent in
violation of the Fifth Amendment.  The court dismissed this claim for lack of subject matter
jurisdiction on October 27, 2011.  <u>Lamson v. United States</u>, 101 Fed. Cl. 280 (2011).

strategy, loading electronic instructions into a virtual reality technology unit equipped with a display for displaying the virtual reality environment and with a patient input device for receiving responses to the environment from the patient, and instructing the human patient how and when to use the virtual reality technology unit to interact with the environment. The interactive environment contains instructions for a scoring procedure for quantitatively analyzing the medical condition of the patient, and/or counseling instructions or self-help instructions. The environment can be used in conjunction with a physical parameter measuring device connected to the virtual reality technology unit. The process is comprehensive and takes place during immersion in fully interactive three-dimensional virtual reality environments utilizing computer generated graphics, images imported from photographs, and video for sensory stimulation. Immersion is achieved with goggles, a head-mounted-display, or other form of visual stimulation, such as surround projection screens or monitors or devices that permit the user to have a virtual experience. It includes the use of voice, music, and sound and other forms of physiological stimulation and feedback. Body sensors and devices such as a hand-held grip permit the user to interact with objects and navigate within the virtual environment.

'764 patent at 1 (reference numbers to figures omitted).

The '764 patent is comprised of four independent claims (Claims 1, 19, 23, and 26) and twenty-seven dependent claims that define the scope of the invented methods.[3] Plaintiff alleges that the government has made unauthorized use of the invention described in Claims 1, 2-4, 7, 9-13, 18-21, 23, and 25-31, inclusive, of the '764 patent. See Revised Joint Claim Construction Statement, ECF No. 32.

The four independent claims of the '764 patent—Claims 1, 19, 23, and 26—describe several methods of treating or evaluating a "psychological, psychiatric, or medical condition in a human patient" using virtual reality immersion therapy.

---

[3] Patents are comprised of two types of claims: independent and dependent.  Independent claims stand on their own as described in a single claim; dependent claims refer to and add further limitations to an independent claim or claims.  See 35 U.S.C. § 112 (2006).

Independent Claim 1 includes all but one of the disputed claim terms (disputed claim

terms are underlined the first time they appear):

1. A method for treating a psychological, psychiatric, or medical condition
   in a human patient, comprising:
   (a) choosing a psychological strategy for treating said psychological,
       psychiatric, or medical condition;
   (b) providing an <u>interactive virtual reality environment</u>;
       (1)  said interactive virtual reality environment comprising a
            <u>technology unit</u> arranged to display to said human patient
            a <u>plurality of virtual reality environments</u>;
       (2)  said technology unit having an <u>input</u> for receiving
            feedback responses to said interactive virtual reality
            environment from said human patient;
       (3)  said technology unit arranged to <u>change said virtual reality
            environment</u> in response to said <u>feedback responses from
            said human patient</u>;
   (c) selecting said virtual reality environment to correspond to said
       psychological strategy;
   (d) encoding electronic instructions for said interactive virtual reality
       environment;
   (e) loading said electronic [instructions] into said virtual reality
       technology unit; and
   (f) instructing said human patient how and when to use said virtual
       reality technology unit so as to experience said interactive virtual
       reality environment and how and when to provide feedback
       responses to said technology unit for changing said virtual reality
       environment so as to treat said psychological, psychiatric, or
       medical condition.

Independent Claim 19 describes a similar treatment method, and contains the remaining

disputed claim term (underlined):

19. A method of treating a psychological, psychiatric, or medical condition in a
    human patient comprising:
    (a) <u>providing a plurality of sets of instructions or steps for treating
        said psychological, psychiatric, or medical condition</u>;
    (b) choosing one of said sets of instructions or steps which is
        appropriate for treating said psychological, psychiatric, or
        medical condition of said human patient;

       (c) providing a virtual reality technology unit arranged to provide an interactive virtual reality environment;

           (1)   said virtual reality [] technology unit being equipped with a display means;

           (2)   said virtual reality technology unit also being equipped with an input means for receiving responses to said interactive virtual reality environment from said human patient;

       (d) providing a set of encoded electronic instructions for said virtual reality environment;

       (e) embedding said one set of instructions or steps in said encoded set of electronic instructions for said interactive virtual reality environment;

       (f) loading said set of electronic instructions into said virtual reality technology unit for displaying said interactive virtual reality environment; and

       (g) instructing said human patient how and when to use said virtual reality technology unit to display said interactive virtual reality environment and how to provide responses to said virtual reality environment.

Independent Claim 23 is nearly identical to Claim 19, replacing the phrase "instructions or steps" with "counseling directions." Finally, independent Claim 26 teaches a method "of evaluating a psychological, psychiatric, or medical condition in a human patient" using a virtual reality technology unit along with a quantitative scoring system to analyze a patient's condition and success:

     26. A method of evaluating a psychological, psychiatric, or medical condition in a human patient, comprising:

       (a) providing a virtual reality technology unit;

       (b) said virtual reality technology unit being equipped with the following:

           (1)   a display means for displaying a virtual reality environment;

           (2)   an input means for receiving responses to said virtual reality environment from said human patient; and

           (3)   a scoring means for quantitatively analyzing said psychological, psychiatric, or medical condition of said patient;

> (c) providing a set of encoded electronic instructions for causing said virtual reality environment to provide, on said display means, graphical representations of an environment which affects said psychological, psychiatric, or medical condition of said human patient;
> (d) delivering said electronic instructions to said virtual reality environment; and
> (e) instructing said human patient how and when to use said virtual reality technology unit to interact with said virtual reality environment by providing responses to said graphical representations.

The remaining asserted claims are dependent claims. Some of the asserted dependent claims describe the types of disorders that the VRIT methods can treat, such as "acrophobia" or "an anxiety disorder." See '764 patent, Claims 3, 13. Other dependent claims add description to the independent claims' virtual therapy methods. For example, Claim 10 provides that the virtual reality therapy method described in Claim 1 stimulates patients using graphical representations in order to treat a disorder. See id., Claim 10 ("The method of claim 1 wherein said virtual reality environment comprises a graphical representation of a situation which stimulates said psychological, psychiatric, or medical condition of said patient, and said changing said virtual reality environment is determined by responses of said human patient to said graphical representation of said situation."). Other dependent claims describe how treatment instructions are communicated to a patient using plaintiff's methods, or describe the scoring system used to measure the condition or success of the patient using VRIT. See, e.g., id., Claim 20 ("The method of claim 19 wherein said set of instructions or steps is communicated to said patient in said interactive virtual reality environment by a graphical representation on said display means for treating said psychological, psychiatric, or medical condition, and further

including evaluating said responses of said human patient to said graphical representation on said display means to define the success of said human patient to said virtual reality environment."); id., Claim 27 ("The method of claim 26 wherein said scoring procedure comprises means for recording said responses of said human patient, assigning values to said responses, and performing a computation on said assigned values to obtain a final score, and further comprising using said final score as a quantitative measure of said medical condition.").  The disputed claim terms are found mainly in the independent claims of the '764 patent.[4]

The patent's specification begins with a brief history of mental health care, and claims several improvements over prior art involving mental health, self-help treatment options, and virtual reality technology.  In particular, the specification describes improvements over prior art that involve treatment methods that use visual or auditory stimulation, but that do not involve patient interaction with an immersive virtual reality environment.  See, e.g., id. col.2 ll.25-65.  The specification also describes improvements over prior art that involve virtual reality technology, but that do not use three-dimensional, immersive virtual environments for the treatment of psychological or psychiatric conditions, or fail to offer a rigorous method for doing so.  See id. col.5 l.11-col.6 l.28.

---

[4] In their revised joint claim construction statement, the parties cite to only certain independent claims when identifying where the disputed claim terms are located in the patent-in-suit.  The table that lists the parties' respective claim construction positions in Part I.B, infra, also lists all of the asserted claims that use the disputed terms.

The specification includes a preferred embodiment of a virtual reality therapy technology unit and a detailed description of how to use plaintiff's VRIT methods to treat different types of disorders.  The preferred embodiment of the technology unit includes a computer unit equipped with peripheral technology supporting the production of virtual reality environments for viewing and interaction by the user.  Id. col.14 l.15-col.15 l.26.  The patent also includes a block diagram of the components of this technology unit.  Id. fig. 1.  The specification then describes how virtual reality immersion therapy is used to treat different types of disorders, such as anxiety disorders or substance abuse.  Id. col.15 l.58-col.26 l.28.  The '764 patent includes one flowchart illustrating the "psychological strategies for selecting a virtual environment," seven flowcharts showing how a virtual environment is used for treating psychiatric, psychological, or medical conditions, and one flowchart showing how virtual therapy is used in the self-help context.  Id. figs. 2-9.  The portions of the specification relevant to the court's claim construction analysis are discussed in greater detail in Part II, below.

**B.    Disputed claim terms.**

The parties provided the court with claim construction briefs and a revised joint claim construction statement.  The parties present seven terms for the court's construction.  The following chart presents the parties' positions:

| Term | Asserted Claim(s) Using Term | Plaintiff's Proposed Construction | The Government's Proposed Construction |
|---|---|---|---|
| "interactive virtual reality environment" | 1, 19, 20, 23, 28 | A computer generated 3-dimensional immersive | A computer generated environment that allows movement |

| | | environment that allows movement and navigation | and navigation |
|---|---|---|---|
| "technology unit" | 1, 2, 19, 23, 26 | A set of equipment and personnel comprising a computer unit, movement and navigation device, and a display which is either head-mounted or a screen | A set of equipment comprising a computer unit, hand-held grip, and a display which is either head-mounted or a screen |
| "plurality of virtual reality environments" | 1 | Two or more virtual environments, which may be merely modified forms of a single general environment | Two or more virtual environments |
| "feedback responses from said human patient" | 1, 2, 19, 23, 26[5] | The return to the technology unit (clinician or computer) of user reaction to all or part of the interactive virtual reality environment | The return to the technology unit from an input device caused by the user's reaction to the virtual reality environment |
| "input" and "input means" | 1, 19, 23, 26 | Verbal, physical, or electronic signals or information provided from the patient concerning the patient's response to the virtual reality environment | Electronic signals or information provided from an input device, display or keyboard by the patient concerning the patient's response to the virtual reality environment |
| "change said virtual | 1 | The computer either | The computer |

---

[5] The parties' revised joint claim construction statement indicates that this term can also be found in Claim 23. However, Claim 23 does not use the phrase "feedback responses" and instead, along with independent Claims 19 and 26, refers to an "input means for receiving responses to said interactive virtual reality environment from said human patient" (emphasis added).

| reality environment" | | automatically or by clinician operation modifying the virtual reality environment which is viewed on the screen or display | generates changes to the existing virtual reality environment, which changes can be viewed on the screen or display |
|---|---|---|---|
| "providing a plurality of sets of instructions or steps for treating said psychological, psychiatric, or medical condition" | 19, 23[6] | Giving the clinician, technology unit and/or patient multiple lists of instructions or steps for the technology unit, clinician, and/or patient to execute in order to obtain treatment for a particular psychological, psychiatric, or medical condition | Giving the patient multiple lists of instructions or steps for the patient to execute in order to obtain treatment for a particular psychological, psychiatric, or medical condition |

Briefing on claim construction was completed on November 19, 2012. The court held a joint status conference on December 4, 2012, during which the parties indicated they did not seek a claim construction hearing and that, rather, the court could construe the disputed claims based on the parties' briefs. The parties submitted a revised joint claim construction statement on December 12, 2012.

---

[6] The parties' revised joint claim construction statement indicates that this term can also be found in Claim 23. However, Claim 23 uses the slightly different phrase "providing a plurality of sets of counseling directions for treating said psychological, psychiatric, or medical condition." The court's construction will pertain to both "providing a plurality of sets of instructions or steps," as in Claim 19, and "providing a plurality of sets of counseling directions," in Claim 23, as this difference does not impact the parties' main dispute for this term. Instead, the parties' dispute involves whether only the patient receives and executes the instructions, steps, or counseling directions for treatment, or whether the clinician, technology unit, or patient may receive and execute the instructions, steps, or counseling directions under the methods described in those claim terms. See infra Part II.G.

## II.    DISCUSSION

"It is a 'bedrock principle' of patent law that the claims of a patent 'define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Claim construction is the first step in any patent infringement case because it is necessary to understand the precise scope of an invention before the trier of fact can determine whether it has been used by the alleged infringer without permission.  SecurityPoint Holdings, Inc. v. United States, No. 11-268, 2013 WL 659543, at *2 (Fed. Cl. Feb. 20, 2013).  The scope and meaning of the patent is a question of law to be answered by a trial court.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-90 (1996).

The "objective baseline" from which to begin claim construction is to inquire "how a person of ordinary skill in the art understands a claim term."  Phillips, 415 F.3d at 1313.  The court generally assigns meaning to claim terms "according to the customary understanding of a person of ordinary skill in the art who reads them in the context of the intrinsic record."  Agilent Techs., Inc. v. Affymetrix, Inc., 567 F.3d 1366, 1376 (Fed. Cir. 2009) (citing Phillips, 415 F.3d at 1312-13).  The intrinsic record includes not only the particular claim in which the disputed term occurs, but also the words of the patent itself, the patent's specification, and the patent's prosecution history.  Phillips, 415 F.3d at 1313-19.   The use of intrinsic evidence to interpret claims is preferred over the use of extrinsic evidence, such as dictionaries, treatises, and expert testimony.  Chamberlain Grp., Inc. v. Lear Corp., 516 F.3d 1331, 1335 (Fed. Cir. 2008).  While the court may

consult extrinsic evidence in its discretion, extrinsic evidence cannot be used to vary the

meaning of terms contrary to the unambiguous meaning expressed in the intrinsic

evidence.  Phillips, 415 F.3d at 1317, 1324.  For example, the Federal Circuit has

specifically advised that a court may rely on a dictionary definition when construing

claim terms only "so long as the dictionary definition does not contradict any definition

found in or ascertained by a reading of the patent documents."  Phillips, 415 F.3d at

1323-24 (quotation omitted).

Thus, the court will interpret the subject claim terms through the eyes of a person

of ordinary skill in the art,[7] using the language of the claims, the specification, and the

prosecution history.[8]  The court begins with the claims themselves.  Phillips, 415 F.3d at

1312 (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)

("First, we look to the words of the claims themselves . . . to define the scope of the

---

[7] The parties initially disagree as to the definition of a person of ordinary skill in the art.  Plaintiff
asserts that the person of ordinary skill in the art is a clinical psychologist or psychiatrist.  The
government submits that a person of ordinary skill in the art is "a person with a strong
background in treatment of psychological, psychiatric, or medical conditions" with "knowledge
in computer programming and game creation being a preferable, but not required, attribute."
The parties' dispute thus centers on the type of medical background and the computer
programming knowledge that the person of ordinary skill in the art must possess.

The determination of the person of ordinary skill in the art is not dispositive of the claim
construction in this case, and the court therefore does not resolve this issue here.  Neither party's
arguments on claim construction are supported by expert opinion or depend otherwise on the
resolution of this issue, nor is there a significant difference between the parties' definitions of the
person of ordinary skill for the purposes of claim construction.   The court's analysis would not
differ based on either party's definition.  Therefore, the court declines to adopt a definition of a
person of ordinary skill in the art at this time.  See, e.g., CoorsTek, Inc. v. Reiber, No. 08-cv-
0113, 2011 WL 1638855, at *3 (D. Colo. May 2, 2011); SecurityPoint Holdings, 2013 WL
659543 at *2.

[8] Neither party relies on the patent's prosecution history in their claim construction briefs.

patented invention.")).  The language of the claims, together with the use of a term within the claim and other claims of the patent in question, as well as the difference between and among claims, "provide substantial guidance as to the meaning of particular claim terms."  Id. at 1314.  In this regard, the court follows the Federal Circuit's guidance that the same claim term should be construed to have the same meaning each time it is used in the same or related patent.  Paragon Solutions, LLC v. Timex Corp., 566 F.3d 1075, 1087 (Fed. Cir. 2009) (quotation and citations omitted); see also Omega Eng'g, Inc., v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

However, the claims must not be read in a vacuum.  Phillips, 415 F.3d at 1315. Instead, the claims must be read "in the context of the entire patent, including the specification."  Id. at 1313.  A patent's specification contains "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same."  35 U.S.C. § 112(a).  The specification also includes preferred embodiments, which illustrate particular implementations of the invention and demonstrate what the inventor believes is the best method of making or using the invention.  See, e.g., Bayer AG v. Schein Pharm., Inc., 301 F.3d 1306, 1316 (Fed. Cir. 2002).  The purposes of the specification are "to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  Phillips, 415 F.3d at 1323.  As such, the specification has been found to serve as "the single best guide

to the meaning of a disputed term," id. at 1315 (quotation omitted), and it is appropriate for the court "to rely heavily" on the specification for guidance as to the meaning of the claims, id. at 1317.

"Consistent with that general principle," the Federal Circuit has recognized that "the specification may reveal a special definition given to a claim term." Id. at 1316.  For example, a patentee may "act as its own lexicographer" and specifically define a claim term, but to do so, "must clearly set forth a definition of the disputed claim term" in the specification.  Medtronic Inc. v. Boston Scientific Corp., 695 F.3d 1266, 1275 (Fed. Cir. 2012) (quotations omitted).   Similarly, an inventor may intentionally disavow a broad claim scope in the specification.  To do so, the specification must contain "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Epistar Corp. v. Int'l Trade Comm'n, 566 F.3d 1321, 1334 (Fed. Cir. 2009); see also Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("[S]ometimes the specification offers practically incontrovertible directions about claim meaning.").

However, the court must also keep in mind that "[t]here is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." Retractable Techs., Inc. v. Becton, Dickinson, and Co., 653 F.3d 1296, 1305 (Fed. Cir. 2011), reh'g and reh'g en banc denied, 659 F.3d 1369 (Fed. Cir. 2011), cert. denied, 133 S. Ct. 833 (2013) (Nos. 11-1154, 11-1278) (citing Phillips, 415 F.3d at 1323).  The court must not improperly limit claim terms based on the specification's preferred embodiments where the claim language represents a broader meaning, unless such an intent is clear from the intrinsic evidence.  See, e.g.,

14

Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1352 (Fed. Cir. 2010) ("[W]hen the specification uses a single embodiment to enable the claims, courts should not limit the broader claim language to that embodiment unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest execution or restriction." (internal quotations omitted)); Abbott Labs., 566 F.3d at 1288.  At the same time, the court should not construe claim terms in a way that excludes an embodiment described in the specification, unless the intent to do so is apparent in the intrinsic evidence.  Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1383 (Fed. Cir. 2008) ("Our case law generally counsels against interpreting a claim term in a way that excludes the preferred embodiment from the scope of the invention.").  Instead, in construing the subject claim terms, the court must "strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."  Retractable Techs., 653 F.3d at 1305.

It is against this backdrop that the court now turns to the disputed claim terms.

**A.    "interactive virtual reality environment"**

Both parties agree that the term "interactive virtual reality environment" should be defined as a computer generated environment that allows for movement and navigation. The parties' dispute centers on whether this computer generated environment should be further construed as "three-dimensional" and "immersive," as plaintiff contends.  The claim language in the '764 patent does not further define "interactive virtual reality environment," or limit that term to a three-dimensional immersive environment.  The

court must therefore determine whether the ordinary meaning of "interactive virtual reality environment," when construed in light of the rest of the patent, includes only "three dimensional" and "immersive" environments to the exclusion of environments that are two-dimensional and non-immersive.

The term "interactive virtual reality environment" is first found in the Abstract of the '764 patent:  "A method of treating a psychological, psychiatric, or medical condition by choosing a psychological strategy for treating the condition, encoding electronic instructions for a virtual reality environment in such a way that the <u>interactive virtual reality environment</u> implements the psychological strategy . . . ." (emphasis added).  The Abstract goes on to state, "The process is comprehensive and takes place during <u>immersion in fully interactive three-dimensional virtual reality environments</u> utilizing computer generated graphics, images imported from photographs, and video for sensory stimulation.  Immersion is achieved with goggles, a head-mounted-display, or other form of visual stimulation, such as surround projection screens or monitors or devices that permit the user to have a virtual experience" (emphasis added).

The specification uses the terms "virtual reality," "virtual environments," and "virtual therapy" throughout its description of the invention.  First, in discussing the prior art concerning virtual reality technology, the specification generally states:

> The term "virtual reality" has been used to describe a computer-generated environment.  When viewed with goggles or head-mounted display, it provides the user with a three-dimensional, fully interactive experience. . . . The technology used to produce virtual reality consists of a graphics-generating computer, a head-mounted-display with a tracking device, a hand-held grip, and other sensory input devices.  Various products may be used to achieve the experience of virtual reality.

'764 patent col.4 ll.13-28 (emphasis added).  This definition suggests that "virtual reality" could be defined broadly to include all computer generated virtual reality environments, with a three-dimensional immersive environment as only an example. However, the specification goes on to explain that "three-dimensional," "immersive," and "interactive" apparently work together in the invented virtual therapy methods:

> Immersive, 3D, fully interactive virtual reality technology was first introduced as part of a psychotherapeutic method by the applicant [plaintiff] (1993) in a Department of Psychiatry for the experimental treatment of acrophobia.  The integration of virtual reality technology with learning principles and psychotherapeutic strategies was given the trademark Virtual Therapy by applicant in 1993.  Virtual Therapy is a trademark for a method of treating acrophobia and other psychiatric conditions by immersion in simulated or virtual environments.  It is more than exposure treatment in a virtual environment and more than imaginal desensitization . . . .

Id. col.4 ll.37-53 (emphasis added).  Next, in describing the "Objects and Advantages" of the invention, the specification states:

> Exposure to Virtual Therapy environments is under the control of the user. During exposure, users encounter situations through visual, auditory, and tactile sensory stimulation.  They may influence or be influenced by that environment.  Virtual Therapy is a rapid, non-invasive form of immersive, three-dimensional, interactive treatment.  Whether used as a therapeutic method by a licensed therapist, mode of education, self-help, or entertainment process, it presents a less-costly alternative to other forms of treatment currently used in psychiatry.
> …
> Virtual Therapy is a new form of treatment that occurs when the patient interacts with a 3D computer generated immersive virtual environment which contains varied objects, images, colors, and sounds.

Id. col.7 ll.55-67, col.10 ll.50-53 (emphasis added).

Following the discussion of the "Objects and Advantages" of the virtual therapy

methods, the specification explains:

> Virtual therapy is primarily a psychotherapeutic, psychiatric, medical,
> educational, and self-help invention for prevention and treatment of
> psychiatric disorders and for problems not otherwise specified in
> psychological assessment and diagnostic literature. The process is
> comprehensive and <u>takes place during immersion in fully interactive three-
> dimensional virtual reality environments utilizing computer generated
> graphics</u>, images imported from photographs, and video for sensory
> stimulation.

<u>Id.</u> col.12 ll.39-48 (emphasis added).

The three-dimensional and immersive nature of plaintiff's invention is also

highlighted in the section of the specification describing the invention's preferred

embodiment. That section describes a computer system equipped with a "digital storage

medium . . . capable of storing electronic instructions for running <u>fully interactive,

immersive, three-dimensional graphics</u> on [a computer unit.]" <u>Id.</u> col.14 ll.61-66

(emphasis added). When detailing how plaintiff's method is used to treat different

disorders, the '764 patent states:

> <u>Since virtual therapy provides a finally interactive, three-dimensional,
> immersive experience under the control of the patient, it is considered the
> best psychological strategy to reduce anxiety</u>. The treatment uses learning,
> termed habituation, to instill self-efficacy and create opportunity for
> mastery experiences. Rather than relying upon distraction to reduce
> emotional distress, the clinician guides the patient through the virtual
> environment, providing adaptive thinking and emotional management
> strategies when the patient engages in distorted thinking and behavior based
> upon failure beliefs.

<u>Id.</u> col.18 ll.35-45 (emphasis added); <u>see also</u> <u>id.</u> col.25 ll.4-8 ("The process is

comprehensive and takes place <u>during immersion in fully interactive three-dimensional</u>

18

virtual reality environments utilizing computer generated graphics, images imported from

photographs, and video for sensory stimulation." (emphasis added)).  Finally, in

discussing the "Summary, Ramifications, and Scope" of the invention, the '764 patent

states:

> The reader will thus see that I have presented a particularly simple method for treating psychological, psychiatric, medical, and self-help conditions in human patients using virtual reality technology.  The method uses three-dimensional, fully interactive, sensory inputs which makes the assessment, diagnosis, and treatment procedures easy to initiate and complete.  The method of Virtual Therapy is less costly and less time consuming than other forms of standard-of-care treatments.

Id. col.26 ll.32-40 (emphasis added).  This section of the specification goes on to

distinguish plaintiff's invention from "other forms" of treatment that involve two-

dimensional scenes:

> Compared to traditional talk therapy, computer generated Virtual Therapy provides patients with rapid relief from painful emotional states and elimination of avoidance associated with acrophobia, and other psychiatric and medical conditions.  Other forms of treatment require patients to imagine a desired behavior or view two-dimensional computer generated scenes while using a keyboard or mouse.  These treatments are not truly interactive.  They are weak and require longer periods of treatment when compared to fully interactive Virtual Therapy interventions using environments that are under the control of the user.

Id. col.26 ll.44-54 (emphasis added).

The specification contains a few references references to two-dimensional

technologies in connection with immersive environments.  When describing the preferred

embodiment of the virtual reality computer system, the '764 patent states:

> The method of the invention is also useful in the following areas:  . . . Assessment, prevention and treatment (including induction states) are achieved with visual, auditory, and tactile sensory stimulation with

assistance of <u>two- and three-dimensional immersion technologies</u>. Such technologies can include a wireless cellular phone fitted with a visual display; a remote site accessed by means of a television monitor; Internet access; wrist, arm, waist, shoulder, neck, and head fitted devices which are band programmed for random or systematic stimulation at home, in a car, in public transportation, or in public areas which provide access services; and a system for projection of images onto walls, ceilings, or floors that appear to be three-dimensional and real.

<u>Id.</u> col.15 ll.42-55 (emphasis added). Similarly, the patent explains that "[a]s technological innovations advance . . . , the delivery of this information through visual sensory input may take varied forms. . . . Virtual therapy may use video in two dimensions or video in three-dimension immersion using a head-mounted display." <u>Id.</u> col.11 ll.51-62.

Both parties argue based on all of the above-quoted language that their respective constructions are supported. After consideration of the parties' arguments, the court adopts plaintiff's construction of this term. For the reasons stated below, the court concludes that construing "interactive virtual reality environment" as a "computer generated three-dimensional immersive environment" most "naturally aligns with the patent's description of the invention." <u>Phillips</u>, 415 F.3d at 1316 (quotation omitted).

As shown above, the specification repeatedly describes plaintiff's virtual therapy methods by referring to their three-dimensional and immersive character. For example, in outlining the objects and advantages of the VRIT method, the specification describes the invention as "a new form of treatment that occurs when the patient interacts with a 3D computer generated immersive virtual environment." '764 patent col.10 ll.50-54. When disclosing examples of how virtual therapy can be used to treat different disorders, the

'764 patent states, "Since virtual therapy provides a <u>finally interactive, three-dimensional,</u> <u>immersive experience</u> under the control of the patient, it is considered the best psychological strategy to reduce anxiety." <u>Id.</u> col.18 ll.35-38 (emphasis added).  In light of these and other consistent descriptions of "virtual therapy" or "virtual environments" as "three dimensional" and "immersive," the court construes "interactive virtual reality environment" to include only "three dimensional" and "immersive" environments.  <u>See</u> <u>In re Abbott Diabetes Care Inc.</u>, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (finding that, even where a patent did not expressly limit a claim term, the specification's particular "repeated[], consistent[], and exclusive[]" description of the invention was enough to limit the claim term) (quotation omitted).

The court recognizes, as the government argues, that "virtual reality" is described in the specification as a "computer-generated environment":

> The term "virtual reality" has been used to describe a computer-generated
> environment.  When viewed with goggles or head-mounted display, it
> provides the user with a three-dimensional, fully interactive experience. . . .
> The technology used to produce virtual reality consists of a graphics-
> generating computer, a head-mounted-display with a tracking device, a
> hand-held grip, and other sensory input devices.  Various products may be
> used to achieve the experience of virtual reality.

'764 patent col.4 ll.13-29.  However, here, when read in the context of the rest of the specification, it is clear that plaintiff did not intend to define "interactive virtual reality environment" so broadly, and instead focused on a three-dimensional, immersive "virtual reality."

Similarly, the court is not persuaded that the language in the specification referring to "two-[dimensional] . . . immersion technologies" dictates that the virtual reality

environment itself encompasses two-dimensional computer generated environments.

'764 patent col.15 ll.42-55.  While the specification acknowledges that a virtual reality

environment may be created using two-dimensional technologies, the specification, as

discussed above, repeatedly uses "three-dimensional" and "immersive" when describing

the virtual environments or therapy methods taught by the patent.  Moreover, the '764

patent expressly distinguishes its three-dimensional, immersive virtual reality therapy

methods from other forms of treatment that use two-dimensional environments.  In this

case, the specification states:

> Compared to traditional talk therapy, computer generated Virtual Therapy
> provides patients with rapid relief from painful emotional states and
> elimination of avoidance associated with acrophobia, and other psychiatric
> and medical conditions.  Other forms of treatment require patients to
> imagine a desired behavior or view two-dimensional computer generated
> scenes while using a keyboard or mouse. These treatments are not truly
> interactive.  They are weak and require longer periods of treatment when
> compared to fully interactive Virtual Therapy interventions using
> environments that are under the control of the user.

'764 patent col.26 ll.44-54 (emphasis added).  The specification therefore demonstrates

an intent to exclude two-dimensional computer generated scenes from the scope of

plaintiff's invention.  "Where the specification makes clear that the invention does not

include a particular feature, that feature is deemed to be outside the reach of the claims of

the patent, even though the language of the claims, read without reference to the

specification, might be considered broad enough to encompass the feature in question."

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed.

Cir. 2001).  Contrary to the government's contentions, the description of the invention in

the specification reveals that a "three dimensional" and "immersive" virtual reality

environment is not simply "preferred," but is instead part of the method invented by

plaintiff.  Accordingly, the court adopts the plaintiff's construction and construes

"interactive virtual reality environment" as: "a computer generated three-dimensional

immersive environment that allows movement and navigation."

**B.    "technology unit"**

The parties next dispute whether the term "technology unit" means either (1) "a

set of equipment and personnel comprising a computer unit, movement and navigation

device, and a display which is either head-mounted or a screen," as plaintiff argues, or (2)

"a set of equipment"—and not personnel—"comprising a computer unit, hand-held grip,

and a display which is either head-mounted or a screen," as the government contends.[9]

The primary disagreement here concerns whether a clinician or other "personnel"

is part of the "technology unit" used in the patent's VRIT methods.  This dispute reflects,

---

[9] The parties' main disagreement concerning "technology unit" focuses on whether a "technology unit" includes personnel.  This primary dispute is resolved above.  The parties' secondary dispute involves whether the "technology unit" is comprised of a "hand held grip" or more generally, a "movement and navigation device," as plaintiff contends.  This dispute arose after the parties submitted their briefs on claim construction, and appears for the first time in the parties' revised joint claim construction statement.

The court has received no guidance from the parties as to this new dispute.  Plaintiff previously defined "technology unit" in his briefs to include a "hand held grip" rather than a "movement and navigation device."  However, while the patent's preferred embodiment of a virtual reality computer system includes a "hand held grip," the court sees no reason to limit the term to specifically include a "hand held grip" rather than a "movement or navigation device."  Nothing in the claims so limits the scope of "technology unit."  In addition, the specification indicates that virtual reality immersion is achieved using "[b]ody sensors and devices <u>such as</u> a hand-held grip, [which] permit the user to interact with objects and navigate within the virtual reality environment."  '764 patent col.12 ll.53-55 (emphasis added).  To narrow "technology unit" to specifically include a hand held grip is improper in this case, and the court adopts plaintiff's broader definition regarding this aspect of "technology unit."  <u>See, e.g. Trading Techs.</u>, 595 F.3d at 1352 (stating that unless there is a clear intention on the part of a patentee, "courts must not import limitations into the claims from the specification").

at bottom, the parties' disagreement over who may "change" the virtual reality environment while a patient is using the technology.   Under the methods taught by the '764 patent, the "technology unit" changes a virtual reality environment based on the "patient['s]" responses to the environment.  Plaintiff does not dispute that, using his methods, the patient may directly change the virtual reality environment through an input device connected to the "technology unit."  However, plaintiff argues that, under his methods, the clinician or other "personnel" may also change the virtual reality environment in response to the patient's reactions because the clinician is also part of the "technology unit."  Plaintiff therefore asserts that "technology unit" includes "personnel." The government argues that, under the patent, the patient alone is responsible for changing the virtual reality environment during immersion, and thus the term "personnel" must be excluded from the construction of "technology unit."  The court must therefore determine whether the claims or the specification demonstrate that "technology unit" includes a human being.

The term "technology unit" does not reference a human being in the claims themselves.  The claims describe several different components of the technology unit. Claim 1 discloses that the technology unit "is arranged to display to [a] human patient a plurality of virtual reality environments," has "an input for receiving feedback responses," and is loaded with "electronic instructions."  Claims 19 and 23 similarly describe the technology unit as "equipped with a display means" and "equipped with an input means," and that an "encoded set of electronic instructions" is "load[ed] . . . into said virtual reality technology unit."  Claims 1, 19, and 23 also disclose that, under

24

plaintiff's method, the patient is instructed "how and when to use said virtual reality technology unit." Finally, Claim 26 discloses that the technology unit is "equipped with the following: (1) a display means for displaying a virtual reality environment; (2) an input means for receiving responses to said virtual reality environment from said human patient; and (3) a scoring means for quantitatively analyzing said psychological, psychiatric, or medical condition of said patient." Nothing in the claims associates a clinician or "personnel" with the technology unit.

The only use of the term "technology unit" outside of the claims occurs in the Abstract:

> A method of treating a psychological, psychiatric, or medical condition by . . . loading electronic instructions into a virtual reality technology unit (10, 22) equipped with a display (14, 40) for displaying the virtual reality environment and with a patient input device (14, 22, 32) for receiving responses to the environment from the patient, and instructing the human patient how and when to use the virtual reality technology unit to interact with the environment. . . . The environment can be used in conjunction with a physical parameter measuring device (36) connected to the virtual reality technology unit (10).

Like the claims, the Abstract does not list the clinician or other personnel as one of the components of the technology unit.

Instead, reference numbers 10 and 22 in the Abstract correspond to certain types of equipment in Figure 1 of the patent, which is described alternatively by the specification as "a block diagram of a virtual reality computer system employed in the method according to the invention," '764 patent col.13 ll.35-36, and "a block diagram of a preferred embodiment of a computer unit 10 equipped with peripheral technology supporting the production of virtual reality environments for viewing and interaction by

the user." Id. col.14 ll.15-18 (emphasis added).  Reference number 10 in Figure 1 is

labeled "computer," and reference number 22 is labeled "hand held grip."  Id. fig. 1.

Figure 1 also contains a keyboard, a mouse, fast graphic chips, a digital storage medium,

a monitor, a recording device, a physical parameter measuring device, tracking sensors, a

speaker, a head mounted display, and a tower.  Id.  Figure 1 does not contain a human

component.

The "Preferred Embodiment" section of the specification describes in detail the

computer system and peripheral technology found in Figure 1.  Following this thorough

description, the specification finally mentions the clinician in connection with monitoring

the patient:

> The block diagram in FIG. 1 shows a particularly convenient embodiment
> for implementing the diagnosis and treatment method. Virtual reality
> computer unit 10, head-mounted display 14, hand-held grip 22 are linked
> together and produce an output shown on a video display monitor 40.  The
> clinician performs on-going assessment of the patient by observing
> reactions to the virtual environment.  The patient's location within the
> virtual environment is continuously shown to the clinician on monitor 40.
> This information permits the clinician to make diagnoses and strategic
> interventions as needed.
> …
> A physical parameter measuring device 36, e.g., a heart rate and blood
> pressure sleeve connected to a recording device 38, is used to monitor
> patient physiological responses during treatment.  The choice of the
> measuring device and recording device is made by the therapist or
> physician, depending on other hardware intended for patient treatment in
> virtual reality or virtual therapy environments.

Id. col.15 ll.1-30 (emphasis added).   According to the specification, therefore, the

clinician "observes" the patient's reactions to the virtual environment, "make[s]"

diagnoses," and chooses the appropriate measuring device for treatment.

The specification contains several other references to the clinician.  In discussing

how the VRIT methods may be used to treat anxiety disorders, the specification states:

> The clinician diagnoses the patient with an anxiety disorder . . . .  By
> following a similar process indicated in FIG. 2, specifically according to
> the flow chart in FIG. 4, the clinician recommends graded exposure in a
> virtual environment. . . . Rather than relying upon distraction to reduce
> emotional distress, the clinician guides the patient through the virtual
> environment, providing adaptive thinking and emotional management
> strategies when the patient engages in distorted thinking and behavior based
> upon failure beliefs.

Id. col.18 ll.24-45 (emphasis added).  Similarly, in the portion of the specification

discussing how plaintiff's methods may be used to treat other medical conditions, the

clinician's role is described as follows:

> The clinician determines, according to the flow chart in FIG. 9, that
> exposure targeting a medical condition is the best strategy to modify
> neurological processes, mood, physiological conditions related to stress,
> healing from surgery and psychiatric hospitalization. . . . For example, users
> of a virtual environment fitness step-machine may achieve confidence to
> alter the virtual environment with exercise. A sense of climbing can be
> enhanced with scenes depicting arrivals at scenic viewpoints. Verbal cues
> reminding the user to look at the environment, enjoy the scenes, and
> appreciate the moment, are avenues for making positive cognitive shifts.

Id. col.25 ll.29-45 (emphasis added).  The specification further describes clinician verbal

cues in the following way:

> The events that occur during immersion into a computer-generated
> environment stimulate memory. Some pertain to undesirable experiences. A
> sense of threat could unfold from memory, exposure, or both. These occur
> in the same context that also promotes healing. Exposure to phobic stimuli
> is known to provoke situational-bound anxiety or panic. The rapid onset of
> distress appears spontaneous. Therapeutic interventions provided at these
> critical moments can alter patient dysphoria: "Breathe deeply. Stay there
> long enough to realize you are okay. Look around. You did this
> successfully a few minutes ago. You can do it again. You are safe. You are

27

<u>capable. You're doing it.</u>"  Patients achieve mastery experiences in this
way, and their confidence grows.

<u>Id.</u> col.9 ll.34-46 (emphasis added).   These descriptions suggest that the clinician's

involvement during patient immersion in a virtual environment is limited to providing

verbal guidance and reassurance.

Based on the above cited language, the court agrees that the clinician plays a role

in the treatment method taught by the '764 patent.  However, after consideration of the

parties' arguments and a review of the patent's claims and the specification, the court

concludes for the reasons that follow that "technology unit" as used by the '764 patent

does not include "personnel."

First, the claims themselves describe the "technology unit" as containing only

electronic components, functions, or characteristics.  The technology unit is "arranged to

display" a virtual reality environment, is loaded with "electronic instructions," and is

"equipped" with a "display means" and an "input means."  These descriptions suggest

that the term "technology unit" is limited to equipment.  Furthermore, the claims'

treatment methods require "instructing said human patient how and when to use said

virtual reality technology unit."  That the fact that the patient is provided with and

instructed how to use the technology unit further suggests that the patient uses the

technology unit without the assistance of "personnel."

Second, the Abstract, Figure 1, and specification of the patent also support the

government's construction.  The Abstract thoroughly describes the different types of

equipment that comprise the "technology unit," but does not include or mention the

clinician or "personnel." Indeed, Figure 1 does not include any reference to a human component of the "technology unit." Likewise, the specification's description of the technology unit does not include the clinician or other personnel. While the specification does reserve a role for the clinician, this role is limited to assessing the patient, choosing an appropriate virtual reality environment for the patient, measuring the patient's responses, and being on hand to guide the patient through the environment. The specification does not describe a single situation where the clinician is in control of the virtual environment. To the contrary, the specification includes many examples of the patient controlling the virtual reality environment. For example, in the specification, plaintiff's treatment method is described as an "interactive, three-dimensional, immersive experience under the control of the patient." Id. col.18 ll.35-38 (emphasis added). The specification further describes patient control as an integral part of plaintiff's methods:

> Virtual Therapy is a new form of treatment that occurs when the patient interacts with a 3D computer generated immersive virtual environment which contains varied objects, images, colors, and sounds. A hand-held grip with buttons allows the patient to move forward with a sensation of walking of flying. It will also permit vertical upward or downward movement. The patient can change the environment by moving, adding, removing, enlarging, subtracting, and multiplying the number of objects present. For example, the patient may choose to pick up a chair and move it to another side of the room; turn on a fan; turn the room lights on or off; open a door; add a lamp to a table; drop an object that sounds as if it is breaking. and so on. Collectively, these movements provide therapeutic advantages over other forms of treatment because the patient, then and there, can rehearse and practice tasks previously consider overwhelming, in a safe virtual environment.

Id. col.10 ll.50-67.

In addition, the specification discloses that "patient control" is superior to active clinician involvement.  Virtual therapy is expressly defined in the specification as "a form of treatment that provides exposure <u>under the control of the patient.  Previous exposure methods brought the patient into contact with reality in the presence of a clinical practitioner</u>."  <u>Id.</u> col.9 ll.63-66 (emphasis added).  In describing the objects and advantages of the invention, the patent further states:

> <u>Standard forms of psychotherapy utilize face-to-face visits with a clinician</u> (therapist), group therapy, psycho-educational workshops (classes), and medications (which is an invasive procedure).  <u>Virtual Therapy does involve a therapist.  But the treatment takes place in a virtual environment where the patient has the opportunity to face challenges and struggles by visual and auditory immersion. Virtual encounters permit the patient to rapidly confront and resolve problems</u> resulting in anxiety, panic, phobias, depression, and chemical dependency.
> …
> In Virtual Therapy, the patient interacts with the technology and virtual environment.  The patient influences the environment and is influenced by it.  <u>Thus, transference to the therapist is eliminated because the patient's focus is absorbed by interactions with the virtual environment</u>.
> …
> <u>The personality of the therapist is less important with this form of treatment than others because the patient interacts with the technology to receive corrective experiences</u>.  It eliminates arguments about the nature of the cure because it is less the therapist and more the quality of the virtual environment interaction that leads to patient health.

<u>Id.</u> col.10 ll.6-25, col.11 ll.10-19.  Although the court must be cautious not to improperly limit claim terms by the embodiments described in the specification, <u>see, e.g.</u>, <u>Trading Techs.</u>, 595 F.3d at 1352, here, the consistent references to patient control as superior to clinician involvement displays a clear intent on the part of the patentee to place the patient, not the clinician, in control of the virtual environment, and to exclude the

clinician or other personnel as part of the technology unit which the patient uses and controls.

For all of these reasons, the court finds that the term "technology unit" does not include human "personnel."  The court therefore construes "technology unit" as:  "a set of equipment comprising a computer unit, movement and navigation device, and a display which is either head-mounted or a screen."

### C.     "plurality of virtual reality environments"

The disagreement over the claim term "plurality of virtual reality environments" specifically involves the word "environments."  Plaintiff urges the court to construe this term as:  "two or more virtual environments, which may be merely modified forms of a single general environment."   The government urges adoption of a simpler construction:  "two or more virtual environments."  The government argues that a "virtual reality environment" is a single virtual world that corresponds to a particular treatment strategy, and that a "plurality of virtual reality environments" means more than one such virtual world.  Plaintiff agrees, but adds that "plurality of virtual reality environments" must also mean the changing scenes of a single virtual world.

Claim 1 is the only claim that uses this disputed term.  As discussed supra, Claim 1 teaches:

1.  A method for treating a psychological, psychiatric, or medical condition
    in a human patient, comprising:
        (a) choosing a psychological strategy for treating said psychological,
            psychiatric, or medical condition;
        (b) providing an interactive virtual reality environment;

31

(1) said interactive <u>virtual reality environment</u> comprising a technology unit arranged to display to said human patient a <u>plurality of virtual reality environments</u>;

(2) said technology unit having an input for receiving feedback responses to said interactive <u>virtual reality environment</u> from said human patient;

(3) said technology unit arranged to change said <u>virtual reality environment</u> in response to said feedback responses from said human patient;

(c) selecting said <u>virtual reality environment</u> to correspond to said psychological strategy;

(d) encoding electronic instructions for said interactive <u>virtual reality environment</u>;

(e) loading said electronic [instructions] into said virtual reality technology unit; and

(f) instructing said human patient how and when to use said virtual reality technology unit so as to experience said interactive <u>virtual reality environment</u> and how and when to provide feedback responses to said technology unit for changing said <u>virtual reality environment</u> so as to treat said psychological, psychiatric, or medical condition.

'764 patent, Claim 1 (both singular and plural of disputed claim term underlined).  The

disputed claim term is mentioned in the context of the "technology unit," which is

arranged to provide "a plurality of virtual reality environments."  Claim 1 uses the

singular "virtual reality environment" to correspond to a virtual world chosen for a

particular treatment strategy, which can be experienced and modified by the patient.

Not surprisingly, the specification contains many references to both the singular

"virtual environment" and the plural "virtual environments."  In describing the preferred

embodiment of the virtual reality therapy unit, the specification states:

A standard monitor 30, keyboard 32, and mouse 34 are used to ready computer 10 for production and display of virtual reality graphics. When computer 10 is ready, <u>a menu showing icons for virtual environments used to treat psychiatric and medical conditions appears on monitor screen 30. For example, when an icon named "VIRTUAL THERAPY of HEIGHTS"</u>

> is selected, a virtual environment used to treat the psychiatric condition of
> acrophobia appears and can be seen through display 14.

'764 patent col. 15 ll.12-22 (emphasis added).  In further describing the use of the

VRIT method for treating acrophobia, the specification states:

> The acrophobia virtual environment contains graphical representations of a
> café with booths, lighting, textured walls, a bar tap or faucet frequently
> associated with the delivery of beer, and a walkway between the booths and
> the bar.  A doorway opens to a checkered patio overlooking a bay, hills,
> and bridge.  A plank extends toward but does not connect to the bridge.
> The space between the plank and bridge reveal a checkered floor beneath.

Id. col. 17 ll.33-40 (emphasis added).  Similarly, when describing how virtual therapy

methods are used to treat different specific disorders, the specification repeatedly uses the

singular "environment," rather than "environments" to describe the changing virtual

world with which the patient interacts:

> Next a virtual environment ("ve") is created for the patient and virtual
> therapy ("vt") is begun[.]
> …
> The clinician recommends graded exposure in a virtual environment [for
> the treatment of anxiety disorders.]
> …
> [T]he clinician guides the patient through the virtual environment.

Id. col.16 ll.58-59, col.18 ll.32-35, 41-45.

After consideration of the parties' arguments, the claims, and the specification, the

court adopts the government's construction of this term.  There is no dispute, in this case,

that "plurality" means "two or more."  Rather, the parties disagree as to whether the

scope of "environments" should, as plaintiff suggests, include modified forms of a single

virtual environment, rather than simply two or more distinct virtual worlds.

Turning first to Claim 1, the use of the singular "virtual reality environment" in that claim indicates that a "virtual reality environment" is a single virtual world, selected to correspond to a particular treatment strategy or disorder, which a patient then experiences and changes during the course of treatment.  Claim 1, section (c) discloses the step "selecting said virtual reality environment to correspond to said psychological strategy."  Claim 1, section (f) involves instructing a patient how to use the technology unit "to experience said interactive virtual reality environment" and how to provide feedback to the technology unit to "chang[e] said virtual reality environment."  Tellingly, under Claim 1, section (f), the patient does not experience or change "a plurality of virtual reality environments" when immersed in the chosen virtual world.  Rather, the claim teaches that the patient experiences and changes the singular "virtual reality environment."  The use of the singular "environment" in this step in particular suggests that the term "plurality of virtual reality environments" does not include the modified forms of one virtual world.

In addition, nothing in the claims indicates that the term "plurality of virtual reality environments" should be given a different construction than simply "two or more" of the singular "virtual reality environment."  Indeed, as noted above, in the absence of any contrary indication, the term "virtual reality environment" should be construed to have the same meaning each time it is used in the claims.  See Paragon Solutions, 566 F.3d at 1087 (Fed. Cir. 2009) (quotation and citations omitted).  To define "environments" as plaintiff asks confuses the distinction between the plural and singular version of this term and does not logically follow from the use of singular term in the claim.  See August

34

Tech. Corp. v. Camtek, Ltd., 655 F.3d 1278, 1284 (Fed. Cir. 2011) (distinguishing claim terms "a wafer" and "a plurality of known good quality wafers").

Moreover, the government's construction is supported by the specification, which, as described above, uses the term "environment" to correspond to different treatment regimens. For example, in describing the café, patio, plank, and bridge scenery used to treat acrophobia, the specification uses the singular umbrella term "acrophobia virtual environment." '764 patent col.17 l.33. This is consistent with the use of the singular in the claims to correspond to a type of treatment strategy, and suggests that the singular term "virtual environment" encompasses the many scenes of that environment that may be changed by the user.

Further, as noted above, Claim 1 uses the term "plurality of virtual reality environments" to further describe the technology unit. The preferred embodiment of the technology unit describes a monitor that displays a menu of treatment icons representing different "virtual reality environments" that a user may select depending on what disorder he or she wants to treat. Id. col. 15 ll.12-22. This description readily matches Claim 1's characterization of the technology unit, which describes the technology unit as being arranged to display a "plurality of virtual reality environments." The preferred embodiment, in line with the claims, suggests that "plurality of virtual reality environments" means two or more virtual worlds that a user may select based on an underlying disorder.

Plaintiff's construction, in contrast, would use the term "virtual reality environments" to describe the changing scenes of one virtual environment. However, the

35

specification often uses the word "scenes," rather than "environments," when referring to the different graphical images within one virtual reality environment.  For example, in describing the use of VRIT for anxiety disorders, the specifications states, "User reactions to virtual scenes vary.  A view of heights from the same vantage point elicits fear from some users and detached interest from others."  Id. col. 18 ll.64-67.  When describing the use of VRIT for medical conditions, the specification states, "A sense of climbing can be enhanced with scenes depicting arrivals at scenic viewpoints. Verbal cues reminding the user to look at the environment, enjoy the scenes, and appreciate the moment, are avenues for making positive cognitive shifts."  Id. col.25 ll.39-45.  In describing an experimental use of virtual reality to treat spider phobia, the specification explains, "A patient was exposed to virtual spider scenes over 12 weeks with each session lasting a total of 50 minutes."  Id. col.5 ll.19-21.

The specification does not expressly define "scenes" to mean the modified forms of a single virtual environment.  However, the specification's use of "scenes" to describe a changing virtual environment coupled with the specification's repeated use of the singular "virtual reality environment" to describe a distinct virtual world supports the government's construction of this claim term.  As noted above, an intention cannot be found in either the claims or in the specification to suggest that "plurality of virtual reality environments" should be construed to mean something different than simply "two or more" of the singular "virtual reality environment."[10]  For all of these reasons, the

---

[10] Plaintiff also argues that he drafted the '764 patent by modifying the claim terms found in an application related to a different patent, U.S. Patent No. 5,678,571 (filed May 23, 1994) ("Brown

court adopts the government's proposed construction and construes "plurality of virtual reality environments" as: "two or more virtual environments."

**D.      "feedback responses from said human patient"**

It is undisputed that, as used in the claims of the '764 patent, the term "feedback responses from said human patient" describes reactions by the patient to the virtual environment that are communicated to the technology unit through an input device.  For example, Claim 1, section (b), adding description to the technology unit, discloses: "(2) said technology unit having an input for receiving feedback responses to said interactive virtual reality environment from said human patient (3) said technology unit arranged to change said virtual reality environment in response to said feedback responses from said human patient."

The difference in the parties' construction of the term "feedback responses from said human patient" is based on the parties' disagreement over the construction of the

---

patent").  Pl.'s Reply at 7.  The Brown patent uses multiple video games programmed into a hand-held computer system for treating medical conditions.  Because, plaintiff argues, the Brown patent is a "very different invention," the court should construe the term "virtual reality environment" as distinct from the different games claimed in that different invention.

The court rejects this argument.  The '764 patent does not expressly disclaim any definition or any claim term used in this different patent.   While prior art cited by a patentee can guide the court as to the proper construction of that term, see, e.g., V-Formation, Inc. v. Benetton Grp. SpA, 401 F.3d 1307, 1311 (Fed. Cir. 2005), here, plaintiff asks to interpret this claim term based on a different term used in a different patent.  The court declines to do so, or to consider this aspect of plaintiff's argument.  In fact, plaintiff's patent does not cite to the Brown patent.  And, as noted, the '764 patent does not indicate that "plurality of virtual reality environments" should be given a different meaning than "two or more" of the singular "virtual reality environment," which the patent describes as one virtual world linked to a disorder or treatment strategy.

term "technology unit."[11]   In particular, plaintiff's construction of this term defines the

technology unit as including both a computer system and a clinician.  Plaintiff construes

"feedback responses from said human patient" as "the return to the technology unit

(clinician or computer) of user reaction to all or part of the interactive virtual reality

environment" (emphasis added).  Having found that "technology unit" excludes a

clinician or other personnel, the court adopts the government's construction of this term

and construes "feedback responses from said human patient" as:  "the return to the

technology unit from an input device caused by the user's reaction to the virtual reality

environment."

E.     "input" and "input means"

The parties next dispute whether the terms "input" or "input means"[12] in the '764

patent include only "electronic signals or information provided from an input device,

display, or keyboard by the patient," as the government contends, or more broadly

include "verbal, physical, or electronic signals or information provided from the patient,"

as the plaintiff argues.   To the extent that the parties' dispute depends on whether the

clinician is part of the technology unit, this dispute is resolved above.  However, the court

---

[11] The parties also disagree as to whether the patient's reaction must be "to the virtual reality environment" or "to all or a part of the interactive virtual reality environment."  The parties provide no arguments in regard to this difference in construction, and the court sees no reason to depart from the government's more simple construction of this term.

[12] Although "input means" evokes a "means plus function clause," 35 U.S.C. § 112 ¶ 6 (2006), neither party contends that "input means" is different in scope than "input."  Accordingly, the court treats these terms as being identical for purposes of claim construction.

finds that the intrinsic evidence also otherwise supports the government's construction of this term.

The claims disclose that the technology unit is equipped with an "input means" that receives responses from the human patient made in reaction to the virtual reality environment. For example, Claim 19 discloses that the technology unit is "equipped with an input means for receiving responses to said interactive virtual reality environment from said human patient." Similarly, Claim 1 discloses that the technology unit has "an input for receiving feedback responses to said interactive virtual reality environment from said human patient." The claims provide no further limitations or descriptions of "input" or "input means."

The specification uses the term "input" in several ways. First, in describing the virtual therapy method, the specification states:

> The term Virtual Therapy was introduced by Lamson (1993) and is used to define a process that occurs when patients are visually immersed in a virtual environment. . . . <u>Auditory and tactile sensory inputs may be included to enhance a user's sense of reality during immersion.</u> In the case of phobias, psychological distress is maintained by beliefs, appraisal of threat, anxiety, and situational avoidance. Healing occurs when users develop thinking strategies that result in reduction of distress, increased confidence, and approach behavior.

'764 patent col.7 ll.55-64 (emphasis added); <u>see also</u> <u>id.</u> col.8 ll.10-12 ("Exposure to visual, auditory, and tactile sensory inputs in the virtual environment are under the control of the user or patient."); <u>id.</u> col.26 ll.35-38 ("The method uses <u>three-dimensional, fully interactive, sensory inputs</u> which makes the assessment, diagnosis, and treatment procedures easy to initiate and complete." (emphasis added)). The court agrees with the

government that the use of "input" in this manner refers to the stimulation provided by the virtual reality environment to the user, not the input to the technology unit of the user's reactions to the virtual environment.  As such, this reference cannot support plaintiff's construction of this term.[13]

The patent also uses "input" to refer to a part of the technology unit—the "input device."  The Abstract and specification reference only electronic components—i.e., "a hand-held grip, joystick, mouse, button, trigger, or the like, or a combination of these devices," id. col.14 ll.45-47—when discussing "input device."  These descriptions confirm that that the term "input" or "input means" is limited to only electronic signals concerning the patient's response to the virtual reality environment.  As discussed in length above, this conclusion is consistent with the court's construction of "technology unit" as excluding a human, such as a clinician.  For these reasons, the court adopts the government's more limited construction of "input" or "input means" and construes these terms as:  "electronic signals or information provided from an input device, display or

_____

[13] Plaintiff also suggests that "input" could include physical signals because the specification describes a patient, in reaction to a virtual environment, "squatting close to the floor while extending the arms and hands to prevent falling." '764 patent col.18 ll.55-60.  Plaintiff argues that this description logically demonstrates that the clinician would then serve as the "input device" that could modify the virtual reality environment based on this reaction.   However, because the court holds supra that the "technology unit" does not include the clinician, the court rejects this argument.  In addition, the court notes that such a construction conflates the patient's responses with "inputs" into the technology unit.  Because the claims use "input" and "responses" from the human patient distinctly, such a construction is improper.  See Z4 Techs., Inc. v. Microsoft Corp., 507 F.3d 1340, 1348 (Fed. Cir. 2007) (holding that where "the written description [in the claims and specification] makes clear that" two claim terms are distinct and used to describe different things, those claim terms should be given different meanings).

keyboard by the patient concerning the patient's response to the virtual reality environment."

### F.      "change said virtual reality environment"

The disputed term "change said virtual reality environment" is only found in Claim 1.  Claim 1 uses this disputed term to describe the technology unit as follows: "said technology unit arranged to <u>change said virtual reality environment</u> in response to said feedback responses from said human patient" (emphasis added).   It is undisputed in the parties' respective constructions that the "technology unit" is responsible for changing the virtual reality environment based on the feedback responses from the patient.  In addition, both parties agree that the "computer" portion of the technology unit may modify the virtual reality environment.

However, the parties disagree as to whether only the computer may change the virtual reality environment, as the government argues, or whether a clinician, by operating the computer, may also modify the virtual reality environment, as plaintiff contends.  As the parties indicate in their briefing, this dispute is resolved by the court's construction of the term "technology unit" to exclude a clinician.  For the reasons discussed above, therefore, the court adopts the government's construction of this term and construes "change said virtual reality environment" as:  "the computer generates changes to the existing virtual reality environment, which changes can be viewed on the screen or display."

### G.   "providing a plurality of sets of instructions or steps for treating said psychological, psychiatric, or medical condition"[14]

The parties' disagreement concerning the final disputed term, "providing a plurality of sets of instructions or steps for treating said psychological, psychiatric, or medical condition," concerns who or what may be "provided" the sets of instructions or steps under that term.  Plaintiff construes the term to mean:  "giving the clinician, technology unit and/or patient multiple lists of instructions or steps for the technology unit, clinician, and/or patient to execute in order to obtain treatment for a particular psychological, psychiatric, or medical condition."  The government argues that only the patient may receive and execute the multiple lists of instructions or steps to obtain treatment.

This disputed term is found in section (a) of independent Claim 19 of the patent-in-suit, and encompasses one of the steps in the method taught by that claim:

> 19. A method of treating a psychological, psychiatric, or medical condition in a human patient comprising:
>> (a) providing a plurality of sets of instructions or steps for treating said psychological, psychiatric, or medical condition;
>> (b) choosing one of said sets of instructions or steps which is appropriate for treating said psychological, psychiatric, or medical condition of said human patient;
>> (c) providing a virtual reality technology unit arranged to provide an interactive virtual reality environment;
>>> (1) said virtual reality [] technology unit being equipped with a display means;
>>> (2) said virtual reality technology unit also being equipped with an input means for receiving responses to said

---

[14] As noted above, the parties also disagree as to the construction of "providing a plurality of sets of counseling directions for treating said psychological, psychiatric, or medical condition," which is found in Claim 23 of the '764 patent.  The court's resolution of this claim term will also resolve the parties' dispute in that regard.  See supra note 6.

interactive virtual reality environment from said human
patient;

(d) providing a set of encoded electronic instructions for said virtual
reality environment;

(e) embedding said one set of instructions or steps in said encoded
set of electronic instructions for said interactive virtual reality
environment;

(f) loading said set of electronic instructions into said virtual reality
technology unit for displaying said interactive virtual reality
environment; and

(g) instructing said human patient how and when to use said virtual
reality technology unit to display said interactive virtual reality
environment and how to provide responses to said virtual reality
environment.

Nothing in the claim language expressly limits who is provided the sets of
instructions or steps described in section (a) of Claim 19.  However, that claim does
distinguish between "instructions and steps for [treatment]", which are chosen to
correspond to a particular condition under sections (a) and (b), and "electronic
instructions," which are loaded into the technology unit under sections (e) and (f).
Specifically, Claim 19 teaches that the "instructions and steps" for a chosen treatment
regimen are "embedd[ed]" into "a set of encoded electronic instructions" that are then
"load[ed]" into the virtual reality technology unit.  As such, Claim 19 separately
describes (1) how the "plurality of sets of instructions and steps" are first received—they
are "provid[ed]"—and (2) how the "technology unit" receives the "instructions or
steps"—through "embedding" and "loading."

The terms "instructions" and "steps" are used in several ways outside of the '764
patent's claims.  The patent's Abstract states, "The interactive environment contains
instructions for a scoring procedure for quantitatively analyzing the medical condition of

the patient, <u>and/or counseling instructions or self-help instructions</u>."  In describing how to use the VRIT method, the specification states:

> <u>In addition, the psychological treatment strategies can include methods of counseling and self-help instructions.</u>  Compact disks (CD) utilizing non-immersive interactive exposure to virtual environments may form part of the overall treatment strategy.  The contents of the CD may include <u>written instructions viewed on a monitor or screen</u>, images and objects to enhance learning and other forms of sensory input to include sound and touch.

'764 patent col.16 l.60-col.17 l.5 (emphasis added).  The specification also refers to "instructions" to describe the use of the VRIT method in a self-help scenario:

> <u>Moreover, the patient participates actively in the treatment by following instructions embedded in the virtual environment</u> or even generating positive physiological responses due to stimuli presented in the Virtual Therapy application.
>
> The method of the invention also provides a treatment to which the patient can resort as the need arises.  The intrinsic fun of a novel, interactive virtual environment ensures higher treatment compliance for all patients, and in particular, adolescents.  <u>The self-help instructions communicated by this method can additionally be used induce patients to independently perform measurements of physical parameters associated with their psychological, psychiatric, or medical condition.</u>

<u>Id.</u> col.27 ll.14-33 (emphasis added).  These passages suggest that some types of treatment instructions could be provided only to the patient.  However, these references do not expressly indicate whether Claim 19 only corresponds to the self-help treatment scenario so that Claim 19's "plurality of sets of instructions or steps" must be provided only to the patient.

The specification also uses the term "therapeutic steps" several times when describing how to use plaintiff's VRIT methods for treating particular disorders.  The specification often refers to the patent's figures and tables to describe these "therapeutic

steps."  See, e.g., id. col.18 ll.34-45 ("The flowchart of FIG. 4 is self-explanatory and

outlines the therapeutic steps described below.").  For example, Figure 4, labeled as a

"flow chart showing how a virtual environment is used for treating other anxiety

disorders according to the invention," lists steps such as "assess anxiety disorder,"

"graded exposure," "situation bound or unexpected panic," "avoidance, "cognitive

behavioral, & physiological interactions," "self-efficacy," and "[virtual environment]

mastery experience."[15]  Id. fig. 4.  Table 1, labeled "Basic Processes of Virtual Therapy,"

contains steps such as "Collaborate on virtual therapy goals," "Discuss principles of

learning in immersion," and "Provide mastery experiences by exposure."  Id. col.16 ll.1-

20.   Other tables in the specification provide similar steps depending on the type of

disorder they address.  For example, when discussing adolescent substance use

prevention, the specification states: "Effective prevention must raise awareness in the

adolescent by the steps outlined in Table 3."  Id. col.24 ll.26-27.  Table 3 describes

"Virtual Therapy Prevention Strategies" for the prevention of substance abuse, such as

"develop relationship," "obtain history of substance abuse and dependency," "immerse in

virtual environment," and "produce opportunities to confront denial and avoidance."  Id.

col.24 ll.29-46.  These tables and figures suggest that the clinician may also receive and

execute instructions when using plaintiff's therapy methods.

---

[15] The other flowcharts in the patent provide similar steps, depending on the type of disorder they
address.  For example, Figure 7, described as a flowchart "illustrating adolescent substance-use
prevention strategies in a virtual environment according to the invention," lists such steps as
"identify population at risk," "target risk factors," "modify drug values," "protective [virtual
environment]".  '764 patent fig. 7.

After consideration of the parties' arguments, the claims, and the intrinsic evidence, the court adopts neither party's construction.[16] Rather, the court concludes that the "plurality of sets of instructions or steps" may be provided either to the clinician and/or the patient for the clinician and/or the patient to execute in order to obtain treatment. The court does not include the technology unit in its construction because, as discussed above, the court has construed technology unit so as not to include a human. Moreover, Claim 19 separately describes how the "technology unit" receives and executes the "instructions or steps" for treatment. In particular, the claims disclose that the instructions for treatment are "embedd[ed]" into "a set of encoded electronic instructions," and then "load[ed]" into the virtual reality technology unit. In contrast, the "instructions and steps" for treatment are simply "provid[ed]" according to the disputed claim term. This distinction suggests that the technology unit does not also receive treatment instructions under the treatment step described by disputed term. The language of Claim 19 thus guides the court to reject plaintiff's inclusion of "technology unit" in the construction this disputed term.

However, nothing in the claims or specification expressly teaches that the patient, but not the clinician, receives the "plurality of sets of instructions or steps" described by Claim 19. Some examples in the specification suggest that the clinician may be provided the instructions, and will then choose, as Claim 19 discloses, one set of instructions or

---

[16] The court is not required to adopt a particular construction of a term, even if the parties have stipulated to it, and the court may arrive at its own constructions of claim terms that differ from the constructions proposed by the parties. See, e.g., Boston Scientific Corp. v. Mircus Corp., 556 F.Supp.2d 1045, 1051 (N.D. Cal. 2008) (citing Pfizer, Inc. v. Teva Pharm., USA, Inc., 429 F.3d 1364, 1376 (Fed. Cir. 2005)).

steps appropriate for treatment.  See, e.g., id. col.16 ll.1-21.  For example, the

"therapeutic steps" in Figure 7 include diagnostic steps that the clinician would most

likely perform, such as "identify population at risk," as well as steps that the patient may

receive and perform, such as navigating a "protective virtual environment."  Id. fig. 7.

On the other hand, the self-help scenario described in the specification also teaches that

plaintiff's methods could be executed on an entirely self-help basis, which indicates that

the patient may receive and execute the "plurality of sets of instructions or steps" without

any clinician involvement.  See, e.g., id. col.27 ll.26-33.

To construe the disputed term as the government asks would limit Claim 19 to

such a self-help scenario, to the exclusion of the specification's additional descriptions of

plaintiff's treatment methods.  While it is not necessary that each claim encompass every

embodiment of an invention described in the specification, Baran v. Med. Device Techs.,

Inc., 616 F.3d 1309, 1316 (Fed. Cir. 2010), the intrinsic evidence in this case does not

convey a clear intent to limit the step taught by the disputed claim term to apply only to

the self-help embodiment of the VRIT method.  Absent such an intent, the court will not

interpret the disputed claim term in a way that excludes the other disclosed embodiments

of plaintiff's invention, where a broad interpretation of the term is consistent with the

intrinsic record.  See Helmsderfer, 527 F.3d at 1383 ("Our case law generally counsels

against interpreting a claim term in a way that excludes the preferred embodiment from

the scope of the invention.").  In this case, the specification describes sets of instructions

and steps that either the plaintiff or the clinician may receive and execute.[17]   The court

therefore adopts a modified version of the parties' construction of this term, and

construes "providing a plurality of sets of instructions or steps for treating said

psychological, psychiatric, or medical condition" as:  "giving the clinician and/or patient

multiple lists of instructions or steps for the clinician and/or patient to execute in order to

obtain treatment for a particular psychological, psychiatric, or medical condition."[18]

## III.   CONCLUSION

The following table summarizes the court's holding for each disputed term.

| Term | Court's Construction |
|---|---|
| "interactive virtual reality environment" | A computer generated three-dimensional immersive environment that allows movement and navigation |
| "technology unit" | A set of equipment comprising a computer unit, movement and navigation device, and a display which is either head-mounted or a screen |
| "plurality of virtual reality environments" | Two or more virtual environments |
| "feedback responses from said human patient" | The return to the technology unit from an input device caused by the user's reaction to the virtual reality environment |
| "input" and "input means" | Electronic signals or information provided from an input device, display or keyboard by the patient concerning the patient's response to the virtual reality environment |

---

[17] This conclusion does not alter the court's holding that the clinician is not part of the technology unit itself.  Rather, as discussed in detail above, under this patent the patient remains in control of the virtual reality environment during immersion and may, in fact, utilize the patent's VRIT methods entirely independent of a clinician.

[18] As noted, Claim 23 contains similar language to Claim 19, replacing "instructions or steps" with "counseling directions."  The court's construction of this term also applies to the corresponding disputed term in Claim 23.  See supra note 6.

| "change said virtual reality environment" | The computer generates changes to the existing virtual reality environment, which changes can be viewed on the screen or display |
|---|---|
| "providing a plurality of sets of instructions or steps for treating said psychological, psychiatric, or medical condition" | Giving the clinician and/or patient multiple lists of instructions or steps for the clinician and/or patient to execute in order to obtain treatment for a particular psychological, psychiatric, or medical condition |

Discovery in this case has been stayed pending claim construction. The parties shall file a joint status report by **April 1, 2013**, setting forth a schedule for discovery and future proceedings in this case. After receipt of the joint status report, the court will schedule a joint status conference to set a schedule for further proceedings.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge